## NEW YORK OYER AND TERMINER.

### MAY, 1849.

Before EDMONDS Justice, and two aldermen.

### THE PEOPLE v. ALEXANDER JONES.

How far the confessions of the accused are to be regarded as evidence of the facts stated in them, or are to be binding and conclusive on him.

Where it is clearly made out that the firing was willful, the intention or motive of the accused is of no moment, and his state of intoxication is not only no extenuation of the offense, but is not even to be considered in inquiring into his capacity at the time to have a motive or intention.

INDICTMENT for arson in the first degree.

The prisoner was a negro, of about thirty years of age, who earned his living by doing any work that was offered. He

was regarded, by all who knew him, as a harmless, trustworthy man. . He lived in the sixth ward, in New York, in what was known as " The Five Points."

There were two dwelling-houses in that ward, three stories high, each, and built of wood, adjoining each other. One was occupied by six families. The front door on the street had no lock, and was never fastened, so that there was at all times free access to all its floors, and to its garret, which was a vacant space just under the roof.

One night, about two o'clock, the occupants of one of the rooms in the third story heard the footsteps of a person ascending the stairs to that floor. From that floor to the garret was a ladder eight or ten feet long. No sound of ascending the ladder was heard, but footsteps were heard on the floor of the garret. Those occupants lighted a candle and stood at their hall door to watch. They saw a colored man descend the ladder, who, as soon as he saw them, ran down stairs, but was pursued by them and seized on the first floor, near the door of exit, where a scuffle ensued, in the course of which the prisoner slipped out of his coat, by which he was held, and made his escape into the street, where he was arrested by the police.

At that moment the alarm of fire was given from the upper part of the house, and it was found that the building was on fire in two places in the garret.

Some repairs had been recently made to the roof, and a large amount of combustible matter, such as shingles, shavings, etc., had been left there. They had evidently been gathered together, and set fire to in two places; one near the head of the ladder, and the other ten or twelve feet distant, and just under the eaves of the roof, which was on fire when the alarm was given.

The prisoner was in his stocking-feet when he was arrested. The next morning his shoes were found in the hall, near the outer door, and, near where he had slipped out of his coat, matches were found on the floor, which, on being analyzed, were found to be a compound of sulphur, charcoal and salt

petre, which, when dry, would burn quick, and with intense heat.

He gave different accounts of the matter. At one time he said that he was going by the house, when two men rushed out and seized him, and "raised a muss." At another time he said he had been hired by two men, whose names he could not give, to set fire to the house, and, at another time, that he was so drunk that he did not know what he was about.

No attempt was made on the trial, by either party, to prove any motive that he could have had for burning the building.

In his coat was found a dirk-knife.

*The Judge* charged the jury that arson in the first degree, consisted in willfully setting fire to, or burning, in the night-time, an inhabited dwelling-house, and the punishment was death.

There was no doubt in the case that the building had been purposely and willfully fired, and the main question was whether the prisoner was the guilty party.

Upon that point the jury had the evidence of the men who followed him, and never lost sight of him, from the moment that he was seen descending from the garret until he was delivered to the police; the facts of his coat, shoes and dirk-knife, being found in the house; that he was in his stocking-feet when caught; that he was in the garret just long enough to kindle the fire that was discovered; and his own admissions.

As to the weight to be given to the admissions, it was necessary that the jury should be cautioned. They were not to be regarded as of the same character with confessions of judgment in civil actions, but, like any other testimony, only as evidence of the truth of the facts stated. In the annals of criminal justice, men had been known to confess themselves guilty of crimes which had never, in fact, been committed. A remarkable case had occurred in this country, where a man and his son had confessed themselves guilty of the murder of a person who was not, in fact, dead, but who had mysteriously

The People v. Alexander Jones.

disappeared, and returned to his home in time to save the lives of the accused. In the days when torture was used, such confessions were not unfrequent, and even in these days it has happened that hope, or despair, or fright, or a spirit of self-sacrifice, have caused untrue confessions to be made. Hence the law has thrown the safeguard of its rules around this species of testimony, and requires that they be received with great caution; not to be disregarded when corroborated by other testimony, and not to be implicitly relied upon unless they are.

Another consideration in behalf of the prisoner was to be regarded. It was urged, and was attempted to be proved, that, at the time, he was too drunk to know what he was about. Now, though the rule is well established that intoxication voluntarily imposed, is no excuse for, or even extenuation of, crime, yet it is proper to consider it in cases where the intention is the main element of the offense, as in homicide, whether there is an intention to kill, and in passing counterfeit money, whether it was known to be counterfeit. In such cases, it may with great propriety be asked whether the mind was in a condition to have the requisite intention or knowledge?

But there was no such element in this case, for when it was clearly made out, as it was here, that the firing the house was willfully done, it was of no consequence what was the motive for, or intention of, the act, nor was it even necessary to prove that the prisoner knew that the building was inhabited. The fact that it was so was all that the law required to be made out.

The motive of the prisoner, then, for perpetrating the offense, or his condition of intoxication, were alike excluded from consideration by the language of the statute defining the crime. How far it might be just or wise to establish so severe a rule, was not for the court or jury to determine; it was enough for them that the law, which it was their duty to administer, was thus written.

The element which entered into the calculation of the law,

when it made the arson of an inhabited dwelling a capital offense, was the danger to human life, and our law — however it may be elsewhere — has nowhere visited upon the destruction of property the same severe penalty it has upon the destruction of life.

Now, suppose in this case it had been clearly made out that the prisoner had been influenced merely by an unregulated desire to witness the bustle and excitement which would grow out of a fire among those wooden buildings, in the dead of the night, and had intended, by watching and giving an alarm in time, to take every precaution against the loss of life, would any one say that the offense was as heinous, and deserved as severe a penalty, as if the act had been done with the deliberate purpose of taking life? Yet the law makes no distinction between the cases, and the jury must beware that they did not suffer any such consideration to warp them from their plain duty of administering the law as it was.

The prisoner was convicted and executed.